# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| JOSEPH WATERSTRAAT,<br>    Plaintiff,<br><br>v.<br><br>MECCON INDUSTRIES, INC.,<br>    Defendant. | CAUSE NO.: 2:11-CV-399-PRC |

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment [DE 23] and a Motion to Set Oral Argument on Defendant's Motion for Summary Judgment [DE 25], both filed by Defendant Meccon Industries, Inc. on November 1, 2012. For the reasons set forth below, Defendant's motions are denied.

## PROCEDURAL BACKGROUND

On October 4, 2011, Plaintiff Joseph Waterstraat filed a Complaint against Defendant Meccon Industries, Inc. ("Meccon") in the Lake County, Indiana Superior Court. The Complaint includes a single count of negligence against Meccon.

On November 1, 2011, Meccon filed a Notice of Removal. On November 22, 2011, Meccon filed an Answer to the Complaint denying the material allegations therein and asserting affirmative defenses. Meccon filed an Amended Answer with leave of Court on April 24, 2012.

On November 1, 2012, Meccon filed the instant Motion for Summary Judgment and a Motion to Set Oral Argument on Defendant's Motion for Summary Judgment. On January 23, 2012, Waterstraat filed a response brief, and on February 5, 2012, Meccon filed a reply brief.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof

at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MATERIAL FACTS

On January 6, 2010, Joseph Waterstraat, who was fifty-three years old, fell from a crane while attempting to change a propane tank attached to the turret of the crane. The crane was located on a construction site at the Hammond Sanitary District Facility at 5313 Columbia Avenue in Hammond, Indiana. At the time of his fall, Waterstraat was an employee of Ferrantella Construction, a subcontractor to Meccon, the general contractor. Ferrantella was performing excavating and backfill work as well as controlling the water table. Tyler Boender was a Meccon employee running the CSO Basin project for Meccon. Meccon owned the crane.

The crane was a mobile crane on wheels, with an extendable boom attached to a turret. At the time of Waterstraat's fall, the crane was just east of the head works building. Waterstraat characterized the crane as medium-sized. The turret of the crane was capable of revolving 360 degrees. The propane tank is attached to the turret to provide heat to the cab of the crane.

The engine of the crane is equipped with a cover that rolls back away from the turret on rollers. The engine cover is kept closed by two latches, but, according to Waterstraat, one of the latches was missing on the day of his fall. Waterstraat testified that he does not remember there ever

4

being a second latch on the engine cover. He explained that "[t]he latches were never latched. They didn't work and they didn't hold. You just would pull the engine cover off when you needed to access the engine." Def. Br., Exh. A, p. 61, ll. 7-10. Two handles are attached to the engine cover for rolling it back, although only one handle was used at a time because they were too far apart to use at the same time. Waterstraat had often rolled the engine cover back during his time using the crane. Waterstraat's recollection as to the engine cover was that, "[i]t was so hard to open the engine that it really didn't matter if the latch was latched or not." *Id*. at p. 63, ll. 12-14.

On the day of his fall, Waterstraat arrived at the work site at 6:00 a.m., while it was still dark. The weather had been cold, and there was snow cover. He intended to change the propane tank because there had been no heat in the crane cab the previous day, which made it difficult to see out of the windows because they would fog up and freeze. This was the first time that Waterstraat had to replace the propane tank. The pulley on the front of the crane was frozen, so he heated it with a propane torch. After unfreezing the pulley, Waterstraat ascended a ladder onto the crane, and from the ladder he stepped onto the fuel tank and grabbed something in order to step onto the fender to get to the back of the crane.

Shortly before his fall, Waterstraat was standing on an area behind the air cleaner with one foot on the engine cover. The propane tank housing consisted of a band wrapped around the propane tank, which was secured with a bolt. Waterstraat intended to use a half-inch wrench to loosen the band to remove the tank. However, the bolt was rusted, and Waterstraat was only able to loosen it approximately two turns. As a result, he decided to pull the propane tank up over the band, rather than straight out and down. As Waterstraat pulled the propane tank up with both hands, exerting force "pretty hard" through his legs, the engine cover slid back, away from the propane

5

tank, causing Waterstraat's legs to go out from underneath him. Def. Br., Exh. A, p. 79, ll. 1-9. Waterstraat fell, striking his right shoulder on the edge of the fender. As he fell from the fender, a co-employee standing near the crane softened his fall to the ground.

Although the engine cover was icy at the time, Waterstraat testified that he fell because the engine cover rolled back and that he did not slip on the ice. The engine of the crane was approximately six feet off the ground. There was no personal lift available on the premises for use by Waterstraat.

Waterstraat testified that he was familiar with the particular crane in question, as he had used it between 10 and 50 times since 2005. He also had experience with similar cranes from his work at Central Rent-A-Crane. Although the crane was owned by Meccon, both Meccon and Ferrantella employees used it, and the crane was used as often by Ferrantella employees as it was by Meccon employees. Shawn Norcutt was the other Ferrantella employee who used the crane.

The crane had been left outdoors at the BP refinery for numerous years uncovered. When the crane first arrived at the Hammond site in 2006/2007, Meccon had the crane inspected. Meccon hired Harts Tractor, Co. ("Harts") for yearly inspections and for repairs to the crane. Boender testified that there were a few annual inspections by Harts at the Hammond site between the initial inspection and 2009. Harts would inspect the machinery and discuss with Meccon any issues or repairs to be made. If additional maintenance or repairs were required, Meccon would call Harts to come and repair the crane. In April 2009, Harts did an inspection of the crane. Meccon paid the bills for any repair done to the crane. Waterstraat and other Ferrantella employees did not do maintenance on the crane, and when maintenance was required, Waterstraat would report it to Boender.

6

Boender testified that, as a Ferrantella employee, Waterstraat would do "routine day-to-day" upkeep on the crane, such as checking the oil and changing the propane tank. Waterstraat testified that, before using a piece of equipment, including the crane at issue, he would inspect it. He would walk around the machine to ensure that nothing was visibly leaking or broken and that oils were up and antifreeze was in the equipment. This inspection would usually last about half an hour before work commenced. He would also start the crane and make sure everything was working correctly. Waterstraat testified that the crane had been used the day preceding his fall and that he was likely the person who inspected it prior to its use the previous day.

Boender testified that there were two latches on the engine cover in April 2009 but that he did not use the crane in the winter months later in the year and prior to Waterstraat's fall. When asked whether any Ferrantella employee brought to Meccon's attention the issue with the latch, Boender testified that, during the fall of 2009 and prior to Waterstraat's fall, Waterstraat brought to his attention that the engine cover did not align correctly. Boender acknowledged in his deposition that it was difficult to align the engine cover but that the latch closed. Boender testified that, when Harts came to the work site to make an unrelated repair to the crane that was required for the crane to run, he brought the issue with the engine cover to Harts attention; he does not recall whether Harts actually worked on the engine cover. In contrast, earlier in his deposition, Boender testified that the latch issue never came up with Harts. Pl. Br., Exh. 1, p. 37, ll 11-14. Boender testified that his focus at that time was on getting the crane running. Chuck Melvin, another Meccon employee who also used the crane, believed that the engine cover had one latch.

7

At the time of the fall, Waterstraat was a member of the operating engineer's Union Local 150 since June 1979, had completed the union apprenticeship program, and had operated machinery most of his adult life.

**ANALYSIS**

Meccon seeks summary judgment in its favor first on the basis that it did not owe Waterstraat a duty to protect him from injury because the engine cover was never intended to be used as step. Second, Meccon argues that, even if it owed a duty to Waterstraat, Waterstraat was the sole proximate cause of his own injuries. Waterstraat responds that Meccon owed him a duty because it controlled the crane and that the issue of proximate cause is a fact determination for the jury.

To recover in a negligence action under Indiana law, a plaintiff must establish: (1) a duty on the part of the defendant to conform its conduct to a standard of care arising from its relationship with the plaintiff; (2) a failure on the part of the defendant to conform its conduct to the requisite standard of care; and (3) an injury to the plaintiff proximately caused by the breach. *Schlotman v. Taza Café*, 868 N.E.2d 518, 521 (Ind. Ct. App. 2007) (citing *Merchants Nat. Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d 383, 386 (Ind. Ct. App. 2000)). "Absent a duty, there can be no breach and, therefore, no recovery in negligence. *Id.* "Whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide. *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003).

In arguing that it did not owe Waterstraat a duty, Meccon applies the three-factor test for determining the existence of a legal duty set forth in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991). However, as argued by Waterstraat, "when the element of a duty has already been declared or otherwise articulated, there is no need to apply the test established in *Webb*." *Messer v. Cerestar*

*USA, Inc.*, 803 N.E.2d 1240, 1244 (Ind. Ct. App. 2004) (recognizing that the Indiana Supreme Court had curbed the use of the *Webb* factors when the element of a duty has already been declared (citing *Sharp*, 790 N.E.2d at 465)).[1] In this instance, because prior case law has articulated the applicable duty–that being the duty a property owner owes to employees of an independent contractor, use of the *Webb* test is unnecessary. *See Messer*, 803 N.E.2d at 1244 (finding the *Webb* factors inapplicable in light of the well-settled area of law involving the duty owed by the possessor of a premises to the employees of an independent contractor).[2]

Generally, the owner of property is under no duty to provide an independent contractor with a safe place to work. *Pelak v. Ind. Indus. Servs., Inc.*, 831 N.E.2d 765, 769 (Ind. Ct. App. 2005); *Daisy v. Roach*, 811 N.E.2d 862, 866 (Ind. Ct. App. 2004); *Zawacki v. U.S.X.*, 750 N.E.2d 410, 414 (Ind. Ct. App. 2001). "However, the owner has a duty to maintain the property in a reasonably safe condition for business invitees, including employees of independent contractors." *Messer,* 803 N.E.2d at 1244; *Bethlehem Steel Corp. v. Lohman*, 661 N.E.2d 554, 556 (Ind. Ct. App. 1995) (citing *McClure v. Strother*, 570 N.E.2d 1319, 1322 (Ind. Ct. App. 1991); *Orville Milk Co. v. Beller*, 486 N.E.2d 555, 559 (Ind. Ct. App. 1985)); *see also Parojcic v. Bethlehem Steel Corp.*, 128 F.3d 601, 603 (7th Cir. 1997) (noting that this standard applies to employees of a subcontractor as well).

Although Meccon is not the owner of the premises at the Hammond Sanitary District work site, a general contractor such as Meccon working on behalf of a land owner is held to the same

---

[1] The three *Webb* factors are (1) the relationship between the parties; (2) the reasonable foreseeability of the harm to the person injured; and (3) the public policy promoted by recognizing an enforceable duty. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991); *see also Key v. Hamilton*, 963 N.E.2d 573, 581 (Ind. Ct. App. 2012) (applying the *Webb* factors to determine whether a duty existed in a motor vehicle collision the precise issue of which had not been addressed by any Indiana court).

[2] In asserting that the test set forth in *Webb* governs whether Meccon owed Waterstraat a duty in this case, Meccon does not discuss whether the law had already articulated the applicable duty.

liability as the landowner. *Rider v. McCamment*, 938 N.E.2d 262, 267 (Ind. Ct. App. 2010) (citing *Taylor v. Duke*, 713 N.E.2d 877, 880 (Ind. Ct. App. 1999) (quoting Restatement (Second) of Torts § 383)); *see also Pelak*, 831 N.E.2d at 769 (discussing the principal that "control over the premises is used to determine who is liable for injuries on the premises"). Indiana Courts follow § 383 of the Restatement (Second) of Torts, which provides:

> One who does an act or carries on an activity upon land on behalf of the possessor is subject to the same liability, and enjoys the same freedom from liability, for physical harm caused thereby to others upon and outside of the land as though he were the possessor of the land.

*See Taylor*, 713 N.E.2d at 880 (quoting Restatement (Second) of Torts § 383 (1965)).[3] Here, Meccon was the general contractor for the construction site, and, as such, Meccon is held to the same liability, and freedom from liability, as the land owner. Accordingly, the Court considers Meccon to be in the same position as the owner/possessor of the property in analyzing the relevant issues related to the duty owed to an employee of an independent contractor or subcontractor. Therefore, Meccon is incorrect that it did not owe Waterstraat a duty, and the Court denies the Motion for Summary Judgment on Meccon's argument that it owed no duty to Waterstraat.[4]

---

[3] In its reply brief, Meccon argues that this is not a premises liability case because the premises were owned by the City of Hammond. Meccon does not address the law cited above that a general contractor such as Meccon working on behalf of a landowner is held to the same liability as the landowner.

[4] In the opening brief, Meccon cites the opinion of its retained expert, Gary L. Buffington, CSP, CRSP, CSHM, WSO-CSE/CSM/CSS, PI, that Meccon did not owe Waterstraat a duty to warn him of an open and obvious hazard and that it was unforeseeable that Waterstraat would use the engine cover as a step and/or work platform. Def. Br., p. 11. However, an expert may not testify as to conclusions of law, such as the existence of a duty. *See In re Estate of Lee*, 954 N.E.2d 1042, 1047 (Ind. Ct. App. 2011).

In his response brief, Waterstraat asserts that *Briesacher v. AMG*, No. 2:03CV331, 2005 WL 5988645 (N.D. Ind. Dec. 16, 2005), a case that relies on the decision in *Peters v. Forster*, 804 N.E.2d 736 (Ind. 2004), is persuasive on the issue of duty. However, *Briesacher* involved an injury to a third party and the application of the "acceptance rule," which involves the liability of a contractor to an injured third party after the contractor's work has been accepted by the owner of the work. 2005 WL 5988645, at *9-10. *Peters* addressed the duty owed to a third party, which *Briesacher* described as articulated as "(1) whether the defendant performed the work from which the plaintiff's injury arose; (2) whether the plaintiff was rightfully on the premises; and (3) 'whether it was reasonably foreseeable that [the] third party would be injured by such work due to the contractor's negligence.'" *Id*. at 10 (quoting *Peters*, 804 N.E.2d at 742-43).

Indiana Courts have followed the Restatement (Second) of Torts § 343 and found that a possessor of land is subject to liability if: (1) the possessor knows or should know of a danger and should realize it involves an unreasonable risk; (2) should expect that invitees will not realize the danger or will not protect themselves against such; and (3) fails to exercise reasonable care to protect the invitees from danger. *Messer*, 803 N.E.2d at 1244 (citing *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1265 (Ind. Ct. App. 2002); *Burrell v. Meads*, 569 N.E.2d 637, 639-40 (Ind. 1991)); *see also Crisp v. I/N Tek, L.P.*, No. 3:05-CV-371, 2008 WL 222287, at *6 (N.D. Ind. Jan. 25, 2008). The parties have not addressed the issue of whether Meccon is liable to Waterstraat under this three-factor test, and they have not submitted evidence of material facts specifically in support of those elements. Although many of the arguments the parties make may be relevant to Meccon's liability under the test, Meccon did not move for summary judgment on this basis and the issues are not fully briefed.[5] Accordingly, the Court declines to address those arguments or analyze liability on the instant motion.

The Court recognizes that Indiana law has also articulated a legal duty owed by a landowner to an independent contractor when the instrumentality causing the injury is in control of the independent contractor. *Bethlehem Steel Corp.*, 661 N.E.2d at 556 (citing *Barber v. Cox Commc'n, Inc.*, 629 N.E.d 1253, 1259 (Ind. Ct. App. 1994)). To establish a duty, the complainant must show either that the landowner assumed control of the instrumentality or had superior knowledge of the potential dangers involved in its operation; otherwise, the landowner owes no duty to the

---

[5] In its reply brief, Meccon argues that the question as to duty is not whether it owed Waterstraat some generalized duty to maintain its equipment, but rather whether it owed Waterstraat a duty to protect him from the harm under the facts of the case, namely that it did not owe him a duty to assure that the engine cover was safe to be utilized as a step. However, this argument goes to the first prong of the liability analysis, which asks whether Meccon knew or should have known of a danger and should have realized that it involved an unreasonable risk.

independent contractor's employee. *Id*. However, this doctrine only applies when the injury-causing instrumentality, in this case the crane, is in the control of the independent contractor. *See Martin v. Am. Nat. Can Co.*, 975 F. Supp. 1153, 1158-59 (1997) (citing cases).

The situation is *Bethlehem*, cited by Waterstraat, is not analogous to the instant case on the threshold element of whether the instrumentality was in the control of the independent contractor. In *Bethlehem*, the crane on which the employee of the independent contractor was injured was not owned by defendant Bethlehem Steel Corporation ("Bethlehem"); rather Bethlehem hired an independent contractor to "furnish all necessary supervision, labor, material, equipment and insurance to provide and operate 150 Ton Crawler Cranes" and to "furnish all necessary supervision, labor, material, insurance and equipment to perform general maintenance type work." 661 N.E.2d at 555. Thus, the crane had been provided by the independent contractor who employed the injured plaintiff, and the crane was owned by a third party. *Id*. Because the crane was in the control of the independent contractor, the court went on to consider whether there was evidence that Bethlehem had assumed control over the "means and manner of operating the crane or providing maintenance and repair work . . . ." *Bethlehem*, 661 N.E.2d at 557. The court determined that Bethlehem had not.

In contrast, in this case, the undisputed evidence of record is that the crane was owned by Meccon and that Meccon permitted Ferrantella employees, including Waterstraat, to use the crane. In practice, the crane was used alternately by both Ferrantella employees (Waterstraat and Norcutt) and by Meccon's employees (Boender and Melvin). Although Waterstraat and other Farantella employees conducted daily inspections and minor repairs to the crane, Meccon retained control over major repair work done to the crane. In this case, because the crane was not controlled solely by

12

Farantella, there was no control for Meccon to assume; the control already rested with Meccon. Thus, the instrumentalities doctrine is inapplicable under the circumstances.[6]

The second basis on which Meccon seeks summary judgment in its favor is that Waterstraat's own conduct was the sole proximate cause of his fall. Meccon offers no law in support of this argument; rather, Meccon cites the opinion of its retained expert regarding numerous deficiencies in Waterstraat's conduct leading up to the fall. Proximate cause is generally an issue of fact to be determined by the jury. *See Rhodes v. Wright*, 805 N.E.2d 382, 386 (Ind. 2004). Proximate cause becomes a question of law when only a single conclusion can be drawn from the designated facts. *See Hamilton v. Ashton*, 846 N.E.2d 309, 316 (Ind. Ct. App. 2006). "A party's act is the proximate cause of an injury if it is the natural and probable consequence of the act and should have been reasonably foreseen and anticipated in light of the circumstances." *Munsell v. Hambright*, 776 N.E.2d 1272, 1279 (Ind. Ct. App. 2002) (citing *Ashcraft v. NE Sullivan Cnty. Sch. Corp.*, 706 N.E.2d 1101, 1105 (Ind. Ct. App. 1999)).

Waterstraat knew that there were issues with the engine cover and that it was difficult to latch. However, Waterstraat's experience with the engine cover was that it was extremely difficult to roll back in the normal course of its use. At the time he attempted to change the propane tank, it appears that Waterstraat did not know of any other manner in which to complete that task, and there was no personal lift at the work site available for him to use as suggested by Meccon's retained expert. The expert also suggested that Waterstraat should have walked off the job, which Waterstraat argues is unrealistic. Meccon suggests that Waterstraat is at fault because there was ice

---

[6] Waterstraat argues, in a conclusory fashion, that *Bethlehem* supports his assertion that Meccon owes him a duty because "all of the control of the crane was reserved and utilized by Meccon." Pl. Br., p. 8. Waterstraat is correct that Meccon controlled the crane to a great degree; however, this was because it was Meccon's crane from the outset and *not* because Meccon assumed control of the crane from the independent contractor (Ferrantella).

13

on the crane and that he failed to take reasonable precautions; however, Waterstraat's testimony is that he fell because the engine cover moved and not because he slipped on the ice.[7]

Also, there is evidence that Meccon, through Boender, was aware of issues with latching the engine cover. In its reply brief, Meccon cites the deposition testimony of Melvin, a Meccon employee, that to change the propane tank, he would have worked off the front deck of the crane, which would have only required the climbing of two steps on to the flat deck;[8] this suggests that at least someone at Meccon was aware of an alternate method of changing the propane tank. Meccon offers this testimony as evidence of an alternate *safe* method for changing the propane tank. However, this method appears to conflict with the opinion of Meccon's expert regarding the indicia of what constitutes a step and/or work platform because Melvin described the area of the front deck between the fender wells as "steel" that is "smooth." Def. Reply, p. 19. In contrast, Meccon's retained expert stated that the engine cover was not intended as a step, in part, because it did not have a non-slip surface: "P&H Crane Manufacturer did not design the engine cover to serve as a step and/or work platform *in that* the surface did not contain a non-slip surface, there were no handrails, midrails, or toeboards, etc." Def. Br., Exh. F, Report p. 13 (emphasis added).

From all these facts of record, the Court cannot find as a matter of law that only one inference or conclusion can be drawn from the evidence that Waterstraat was the sole proximate cause of his fall. Accordingly, summary judgment is also denied on this additional basis.

---

[7] In its reply brief, Meccon raises the argument for the first time that Waterstraat has presented no evidence that the existing latch was defective or that two functioning latches would have prevented the engine cover from rolling back when placed under the stress of Waterstraat's weight. Because the argument was raised for the first time in the reply brief, the Court declines to consider it.

[8] The Court notes that only pages 18-20 of the deposition are attached to the reply brief and that there is no deposition cover page or any other document identifying the deponent.

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Defendant's Motion for Summary Judgment [DE 23] and **DENIES as moot** the Motion to Set Oral Argument on Defendant's Motion for Summary Judgment [DE 25]. The Court **REAFFIRMS** the June 7, 2013 final pretrial conference and the July 8, 2013 jury trial setting.

So ORDERED this 13th day of May, 2013.

                                            s/ Paul R. Cherry
                                            MAGISTRATE JUDGE PAUL R. CHERRY
                                            UNITED STATES DISTRICT COURT

cc:    All counsel of record